The Little Rock Junior College *v.* The George W. Donaghey Foundation.

5-622                                                  277 S. W. 2d 79

Opinion delivered March 28, 1955.

*Bailey, Warren & Bullion,* for appellant.

*H. M. Armistead* and *Barber, Henry & Thurman,* for appellee.

ROBINSON, J. This is a suit for a declaratory judgment whereby the beneficiary of a trust asks that a deed in trust be construed. George W. Donaghey and his wife, Louvenia Donaghey, conveyed by a deed in trust to named trustees, ''for the exclusive use and benefit of the present Little Rock Junior College,'' certain real estate in the City of Little Rock. The deed provides, *inter alia*:

''It is the object and purpose of this deed to convey the property herein described to said Trustees, their successors and assigns for the purpose of creating a fund or foundation to be used for the sole and exclusive benefit of the present Little Rock Junior College, an institution of learning in said city, at the present time operated under the management of the Board of School Directors of the Special School District of Little Rock, Arkansas, investing said Trustees with full discretion to select some other public school or schools in said city, operated by or under the management or supervision of the Board of School Directors of the said Special School District of Little Rock, and their successors in charge of the public schools in the said City of Little Rock, in the event the present Little Rock Junior College or its successors, should at any time cease to be operated by or under the supervision of the public school authorities in said City.

''Said Trustees, their successors or assigns, shall have the sole and exclusive management, control and direction of said property, with the right to extend, renew, change or refinance the present or any future indebtedness against said property, its income or proceeds, or any part thereof, with the right to create additional liens or encumbrances on said property, the income therefrom or proceeds thereof, or any part thereof,

and in every respect to deal with and handle and manage said properties as an individual could do, said Trustees or their successors to be guided and limited only by the exercise of their best judgment in the interest of the fund and foundation and its objects and purposes.''

The deed further provides:

''After paying all interest, principal, fixed charges, upkeep, insurance and all operating expenses maturing during any year, the Trustees may annually (or more frequently, if they deem best) pay over on January 1st of each year all or such part of the net income from the said properties as they deem best; such payments shall be made to the proper public school authorities so that the same shall be applied for the maintenance and operation of said Little Rock Junior College, or its successors, or any other public school in said City of Little Rock, selected by the said Trustees in accordance with the authority heretofore expressed. In the event there should at any time be accumulations of net income under the terms hereto, the same may be expended for the purposes of this trust at such times and in such amounts as the Trustees think best.''

At the time the trust was set up the Little Rock Junior College was a two year school. During the first years of the trust, due to a mortgage indebtedness on the property conveyed to the trust, only a comparatively small amount was paid to the college; but subsequent to 1939 payments increased. In 1950 the payment by the trust to the college was in the sum of $45,037.50, and in 1953 it was $75,050.00. In May, 1954, the trustees of the college decided to expand it to a four year college and wrote to the Donaghey trustees as follows:

''It is recommended that the Little Rock Junior College be expanded to a four year senior college, the third year to be added in September, 1954, and the fourth year in September, 1955.''

As a result of this letter from the college, the Donaghey trustees adopted the following resolution:

"It is the sense of the trustees of the George W. Donaghey Foundation that it is their duty to exercise their discretion within the scope of Governor Donaghey's deed in trust to determine a proper worthy beneficiary of the Foundation: That, because of their knowledge of the vastly greater requirements of an adequate four year college over those of a Junior College, the present program of the Board of Trustees of Junior College for its expansion into a four year college has created grave doubts in the minds of the Donaghey Foundation Trustees and that they are therefore not in position at this time to obligate Foundation Funds to Junior College for the ensuing year, as requested by President Granville Davis."

The effect of this resolution was to deprive the college of any funds from the Donaghey trust, and it appears that the school could not survive without such aid. Hence the college rescinded its action in expanding to a four year school, and following this step the Donaghey trust again allotted $75,000.00 to the school for the year 1954-1955. There is no contention that the trustees of the Donaghey trust adopted the resolution stopping payment of trust funds to the school for any reason other than that the college intended to expand.

The college then filed this suit asking that the deed in trust be construed to mean that it is the duty of the trustees of the Donaghey Foundation to pay the profits of the trust to the school, and that the trustees do not have authority to withhold such profits from the college merely because it expands to a four year school. The Chancellor held that the trustees were acting within the authority vested in them by the deed in trust in stopping payment to the school when it was expanded.

On appeal the college contends that a four year school would have the same rights, powers, duties and obligations as a two year school; that the Donaghey trustees acted arbitrarily in withholding the profits of the trust from the college upon its being expanded to a four year institution; and that the college may compel a distribution of the profits from the trust.

Appellees contend a four year college would not be the same school as or a successor to the present Little Rock Junior College; and further that since the founding of the trust the school has become a corporation, is not supervised by the Board of Directors of the Little Rock school district, and hence is no longer entitled to receive anything from the trust.

Considerable argument is devoted to the question of whether a four year college would be a successor to the present school; however, in our opinion the proposition of a successor does not enter into the picture, for the mere fact that the school authorities decided to expand into a four year college in no way changes the identity of the school and does not make of it a school other than the one that the trust was set up to help. *Little Rock Junior College* is merely the name of the school; it is inconceivable that the settlors of the trust used the words in any other way. Loving the college as they did, it is unthinkable that they wanted to help it only if it remained limited in the educational advantages it had to offer, and did not want to give it any further aid if through their generosity the school was able to grow and become a great institution of learning. It is true the deed uses the words "the present Little Rock Junior College." The deed provides: "It is the object and purpose of this deed to convey the property herein described to said trustees, their successors and assigns, for the purpose of creating a fund or foundation to be used for the sole and exclusive benefit of the present Little Rock Junior College." But "the present Little Rock Junior College" is the very same school that wants to expand into a four year college, and by so expanding it does not become another school. When John Doe, a boy 15 years of age, grows up and becomes a man 21 years of age, he is still the same John Doe. It is suggested that the name of the school has now been changed to Donaghey College; in the future another school may adopt the name Little Rock Junior College. That is when the wording in the deed in trust "the present Little Rock Junior College"

would come into play; the new school adopting that name would not be the *present* Little Rock Junior College.

It is argued that Governor Donaghey was interested only in a junior college because he knew of the trials and tribulations of those unable to obtain a higher education, and he wanted to make a junior college available to those unable to bear the expense of a full four year course and that he endowed a "junior college" as such and gave the trustees of the Donaghey Foundation the discretion of selecting some other school as a beneficiary of the trust in the event the Little Rock Junior College ceased to be a junior college. But it is shown conclusively by the writings of both the Governor and Mrs. Donaghey that it was their fondest hope that the Little Rock Junior College would grow into a four year school. Governor Donaghey wrote in his *Autobiography*: "My health is most excellent. Sometimes I have to remind myself that I have celebrated 81 birthdays. . . . I believe that I can say, in all truth, that I am living for the Junior College which I have endowed. . . . When the Donaghey Foundation Board meets, we have great plans for improving the property, and perhaps for constructing a building on the site where the burned theater stood. Shall our plans and dreams lead to a four year college, with a fine new plant of its own? The very thought makes me feel stronger and younger." And the Governor wrote in his volume *Home Spun Philosophy*: "Then, whoever aids in the development of this human power, for any of the vocations of life, renders his community and State a forward service. That is the object of the establishment of the Donaghey Foundation. Today it is sponsoring the fortunes of Little Rock Junior College. This college is affording the young people of Greater Little Rock and the contiguous territory the opportunity of a two-year course in college work with the object of eventually making it four years." It is shown that Mrs. Donaghey stated "that her greatest wish was to see the aim of her husband fulfilled—a four year college in Little Rock."

Where there is an ambiguity in a deed, extrinsic evidence is admissible, not to contradict or vary the terms of the deed, but to place all the facts, circumstances, and position of the parties before the court to the end that the true intent of the grantor may be determined. *Swayne* v. *Vance,* 28 Ark. 282; *Barnett* v. *Morris,* 207 Ark. 761, 182 S. W. 2d 765. It is argued in this case that the extrinsic evidence is not admissible because there is no ambiguity, but the mere fact that appellees are able to make a stout argument in favor of a construction of the deed with which we do not agree in itself shows there is an ambiguity.

Appellants further contend that the declarations of the settlor, made subsequent to the establishment of the trust, are not admissible for the purpose of showing intention, and they strongly rely on the case of *Rufty* v. *Brantly,* 204 Ark. 32, 161 S. W. 2d 11. However, in the Rufty case, after pointing out that extrinsic evidence is incompetent to show the testator's intention in the disposition of property, the court further says:

"In the construction of ambiguous expressions, the situation of the parties may very properly be taken into view. The ties which connect the testator with his legatees, the affection subsisting between them, the motives which may reasonably be supposed to operate with him and to influence him in the disposition of his property, are all entitled to consideration in expounding doubtful words and ascertaining the meaning in which the testator uses them."

Here the principal issue in dispute is the meaning in which the settlor of the trust used the words "the present Little Rock Junior College." Were the words used as meaning a Junior College only, or were they used in the sense of meaning the name of the school endowed? Governor Donaghey's feeling toward the school, and his hopes and ambitions for it, are of paramount importance in arriving at the true meaning of the words used.

Appellants also rely heavily on the case of *United States National Bank of Denver* v. *Brunton,* 112 Colo. 442,

150 P. 2d 297, but in that case the court carefully points out that the trust agreement was not ambiguous, and says:

"We believe the trust agreement is complete and unambiguous, and that there is no need to go beyond its four corners to interpret it."

Here, if we had to construe the deed in trust by staying within its four corners, it would appear that the words "the present Little Rock Junior College" refer to the name of the school. However, since the appellants contend that the words have a different meaning and are used as pertaining only to a Junior College as such, we may go beyond the deed in trust for aid in its construction. It would be hard to find any evidence more satisfactory than the writings of the settlor.

In *Elliott* v. *Gordon,* 10 Cir., 70 F. 2d 9, the court says:

"It is asserted that such declarations were not admissible because they were in derogation of her title. It is well settled that once a trust is established, declarations of the donor thereafter made in derogation of it are not admissible because the estate is irrevocable and it is immaterial what the donor may say after it is created. But the challenged testimony was not offered to overthrow a trust estate. It was not in derogation of appellant's title. That was not the purpose of the testimony. Its purpose was to show that Howerton did not intend to make her a then present gift of the equitable title to the property; that she never had such title. That was the issue in the case; not that a trust had been created and subsequently terminated. The declarations were admissible to show Howerton's intention and his interpretation of what had been done. *Adams* v. *Hagerott,* 8 Cir., 34 F. 2d 899; *Stoehr* v. *Miller,* 2 Cir., 296 F. 414."

In *Adams* v. *Hagerott,* 8 Cir., 34 F. 2d 899, it is said:

"The statements made by Mr. Gaines prior to March 15, 1920, were however, admissible as showing intent, and his subsequent statements were admissible as showing his

interpretation of what had been done. *Talbot* v. *Talbot*, 32 R. I. 72, 90, 78 A. 535, Ann. Cas. 1912C, 1221; *Supple* v. *Suffolk Sav. Bank,* 198 Mass. 393, 84 N. E. 432, 126 **Am.** St. Rep. 451.''

Likewise the declarations of Governor Donaghey were admissible for the purpose of showing his interpretation of what he had done. Such declarations **show,** beyond any shadow of a doubt, that he had endowed a school which he hoped would some day grow into a four-year college.

It appears that in attempting to develop a four-year college the school authorities were doing exactly **what** Governor Donaghey hoped would be done. The trustees of the Donaghey Foundation cannot arbitrarily withhold profits of the trust from the college; and on the other hand, of course, the school authorities cannot expend such money in a manner that would amount to waste. Undoubtedly under the terms of the deed in trust, **the** trustees have full management and supervision of the trust property, and have full authority to exercise good business practices in connection therewith; but the profits must be paid to the beneficiary of the trust, Little Rock Junior College, and the trustees of that institution are the ones who are charged with the responsibility of conducting a school that will use the funds received from the trust to the very best advantage.

But little need be said about appellee's contention that since the college has incorporated, it is no longer under the supervision of the Little Rock *School Board* and is therefore not entitled to receive anything from the trust. Surely appellees do not have much confidence in that theory, for the payments to the college were continued after the four-year program was abandoned.

The deed provides that the school be ''under the supervision of the *public school authorities* in said city.'' The college was incorporated in 1947; section one of Article 5 of the Articles of Incorporation provides: ''The management and administration of the affairs of the corporation shall be vested in a Board of Trustees which

shall always be composed of and limited to duly elected and installed Directors of the Little Rock School District.'' Hence the college is under the supervision of the public school authorities of Little Rock just as much as it is possible to be under such supervision. By incorporating the institution and limiting the personnel of the Board of Trustees to duly elected and installed Directors of the Little Rock School District, the provision in the deed in trust pertaining to the college being supervised by the school authorities of Little Rock is fully complied with.

Reversed with directions to enter a decree not inconsistent herewith.

The Chief Justice, Mr. Justice HOLT and Mr. Justice McFADDIN dissent.

GEORGE ROSE SMITH, J., concurring. I am not convinced that what Governor Donaghey wrote many years after the creation of this trust is of much value in determining his intention as settlor of the trust. But without regard to this evidence I reach the conclusions expressed by Judge ROBINSON and therefore concur in his opinion.

---

GRIFFIN SMITH, Chief Justice, dissenting. Today's prevailing opinion is not restricted to the effect it will have on Little Rock Junior College. In the broader concept of jurisprudence the impact of a decretal order is usually measured by the financial burden it imposes, or gauged by the relief that results when rights are defined.

But infinitely more important to the body of our law is the public's faith in the system it has selected; its unquestioning confidence in the steps one must take to attain permissive ends. And finally there is the right of every competent person to dedicate to purposes of his preference the accretions of life's frugality; to apply, as may be desired, the remainder of one's possessions that have been acquired through the genius of imagination, by dint of ceaseless industry,—and retained because fortune smiled upon thrift at a time when faith was

something more than fantasy and when character was not the subject of pressurized remote control.

There are but few men whose fundamental qualities have more profoundly left their imprint than George W. Donaghey, and it is with the increment of his labors that we deal. It is trite to say that he was born in Louisiana in comparative obscurity. That is true of countless others who have succeeded. Nor is it essential that we emphasize his early struggles, his quest for knowledge, his thirst for information, his willingness to subordinate physical comforts in search of broad horizons in a state where the economic problems were many, yet where mastery over adversity took him to the State University, later into industrial life, then into the Governor's office, and finally into philanthropy.

Governor Donaghey's worldly goods that we denominate as property were set aside for a purpose he thoroughly understood. In order that changing conditions might not defeat the general plan this good man entertained his property was conveyed in trust; and the men chosen as instrumentalities of his design were selected because of their integrity and the training they had received in respect of large affairs. In reliance upon the unimpeachable nature of these friends, Governor Donaghey invested them with broad discretion. That he intended they should function without intervention from without is so clearly reflected by language of the trust that one's credulity is tested by the mere suggestion that his contemplations could conceivably have been along a different line.

These men were his nominees, empowered to select their successors. In the language he made use of they were to supervise the property. The earnings it produced were to be used ". . . for the sole and exclusive benefit of *the present* Little Rock Junior College." To them was given "the sole and exclusive management . . . and direction of said property"; but if events should shape themselves so that the College or its successors should at any time cease to be operated *under the*

*supervision of the public school authorities of Little Rock,* then some other public school or schools might be selected. But this power of selection was not given to the Chancery Court, or to the State's Supreme Court. On the contrary the trustees were authorized to deal with, handle, and manage the corpus and its earnings "as an individual might do," being guided and limited only— By what? Not by the needs of a particular institution! Not by the desires, necessities, academic vision, progressive ideas, or collective fervor of any well-meaning school board or directors of a corporation; and assuredly not at the instance of planning futurists who in 1947—ten years after the death of the donor—were to procure a charter for Junior College as an eleemosynary corporation: a body politic under a statute then appearing as § 2252 of Pope's Digest—a corporation functioning with its own board of trustees. The object of this legal entity was to manage, operate, and administer the school's affairs.

Thus Little Rock Junior College, as it was known to Governor Donaghey, passed from the management of its then superintending authority (the board of school directors of the special school district of Little Rock) and became an institution functioning through a public charter, amenable to the creating statute, and answerable to the courts. Now, by judicial dispensation, the precise power conferred upon the Donaghey trustees is in effect declared fallacious; and this is done in contradiction of what the deed by express provision grants—that the men selected by Governor Donaghey shall be invested with full discretion to select some other public school or schools in Little Rock *operated* by or under the management or supervision of the [designated school directors]—this in the event the *present* Junior College . . . "should at any time cease to be operated under the supervision of the public school authorities of said city."

While it is true that the same individuals who constitute the school board are named as members of the Junior College Corporation, yet their duties and obligations are *not* the same. As members of an elective school board these men and women are amenable to their *elec-*

*tive* duties—duties relating to the entire system as fixed by other laws, and not alone to Junior College. As members of the eleemosynary corporation their duties are to it, and this is true irrespective of any conflict that may exist. But they must serve two masters regardless of divergent interests that may arise.

Now as a matter of common sense we know that directors of the corporation and persons elected to the school board are not conscious of transgression from a common purpose to serve the public school system and Junior College with equal fidelity. Their motives are not challenged. Their patriotic concepts, their tendencies and convictions—these are not in issue. Perhaps if Governor Donaghey had selected them as trustees instead of those he named they would have discharged their obligations with the same conscientious considerations that now actuate them otherwise.

*First,* trustees personally satisfactory to the former governor were named in the deed he executed.

*Secondly,* the wishes of appellants as corporation directors are in conflict with the ideas of prudence entertained by men commissioned by the donor, and the line of demarkation falls far short of being superficial or imaginary.

*Thirdly,* a Junior College Board (created by order of Pulaski Circuit Court eighteen years after the Foundation was established and a decade after Governor Donaghey died) was entrusted with business problems affecting Junior College.

Upon the one hand this court is asked to say whether the discretion conferred by the Foundation's creator is to be upheld; upon the other, whether directors of a corporation—directors acting in substitution for the school board particularized by Governor Donaghey—have a right to say to the Foundation trustees:

You are wrong! It is more consistent with Governor Donaghey's wishes that *we*—not *you*—chart the course of finance and Foundation dispensation! Let *us*

estimate its possibilities and make our demands upon you; and if our requisitions are not honored the courts may be relied upon to say that the Foundation's trustees have either abused their discretion or misconceived their duty; ergo, the corporation's board prevails.

When J. F. Loughborough, G. DeMatt Henderson, Alfred G. Kahn, F. W. Neimeyer, Charles L. Thompson, Leo Pfeifer, and Fred W. Allsopp were chosen by Governor Donaghey to execute the trust he so generously conceived (and when he invested them with the power to select successors if through death or resignation vacancies should occur) an abiding faith was thus expressed. Only three of these men survive: Thompson, Kahn, and Pfeifer. From time to time the trustees selected other men, with the result that today the Foundation is entrusted to John Rule, Clyde Lowry, William Nash, and Dr. Henry Hollenberg. These four now serve with the three survivors—Thompson, Kahn, and Pfeifer.

The Junior College directors (who, as heretofore noted are members of the school board) are Foster A. Vineyard, Mrs. A. E. McLean, Mrs. Lucy A. Dixon, Dr. William G. Cooper, Dr. E. N. Barron, and R. A. Lile. No one questions their integrity, their public capabilities, or the sincere interest they have in the subject-matter of litigation. But the fact remains that Governor Donaghey did not select them as trustees, though with equal propriety and confidence he might have done so.

Perhaps no better illustration of the point I undertake to stress can be shown than words employed in the petition of Junior College when it sought a declaratory judgment:

"Petitioner states that action of the [Foundation Trustees] has created grave doubts *as to the respective rights, powers, duties, and obligations* of the parties hereto under the aforesaid Deed in Trust, and because of the *asserted and assumed power of [the] Trustees* thereunder, [the] College, as beneficiary, is and will continue to suffer irreparable loss and damage *by and*

*through the conflict in authority* between the parties hereto until their relative rights, powers, duties, and obligations under said deed in trust are fully and clearly defined by the court."

Inasmuch as the powers, duties, and obligations of the Foundation Trustees were clearly defined in the deed, and because none of the discretionary power is in contravention of public policy or any law, I would in all respects affirm the Chancellor's decree, conformably to the many decisions of this court dealing with matters of this kind.

J. SEABORN HOLT, J., dissenting. In reaching the conclusion that the decree, from which comes this appeal, should be affirmed, I do so because of the plain and unambiguous terms contained in the Deed of Trust in question here and executed by Governor and Mrs. Donaghey July 1, 1929.

As has been pointed out, by the terms of this Deed, certain Trustees were named to administer the trust, which was made a self-perpetuating body. Under this Trust Deed, Governor and Mrs. Donaghey transferred certain income producing property in Little Rock to the Trustees. The Trust Deed recites:

"It is the object and purpose of this deed to convey the property herein described to said Trustees, their successors and assigns for the purpose of creating a fund or foundation to be used *for the sole and exclusive benefit of the present Little Rock Junior College,* an institution of learning in said city, * * * *investing said Trustees with full discretion* to select some other public school or schools in said city, operated by or under the management or supervision of the Board of School Directors of the said Special School District of Little Rock, and their successors in charge of the public schools in the said City of Little Rock, in the event the present Little Rock Junior College or its successors, should at

any time cease to be operated by or under the supervision of the public school authorities in said city.

"*Said Trustees, their successors or assigns, shall have the sole and exclusive management, control and direction of said property,* * * * and manage said properties as an individual could do, said Trustees or their successors to be guided and limited only by the exercise of their best judgment in the interest of the fund and foundation and its objects and purposes."

How plainer and more understandable language could have been used has not been pointed out by appellants.

"In the administration of a trust, the discovered intent of the trustor is of controlling importance, and the trust is to be administered in the manner laid down by him. Neither the court nor the beneficiary or the legislature is competent to violate such intent and to substitute its discretion for that of the trustor." *54 Am. Jur.,* § 274, p. 218.

"The intention of the settlor which determines the terms of the trust is his intention at the time of the creation of the trust, and not his subsequent intention." *Restatement of the Law of Trusts,* § 4 A, page 16.

"The true rule is that the construction never begins until uncertainty of sense is pretty clearly apparent." *Murphy* v. *Morris, Executor,* 200 Ark. 932, 141 S. W. 2d 518.

"Where there is no ambiguity in an instrument transferring property in trust, extrinsic evidence of grantor's intent is not admissible." *Brewer* v. *Hassett,* 49 Fed., Supp. 501, (Headnote 5).

Thus it plainly appears that the property in question was transferred to the Trustees for the sole benefit of Little Rock Junior College, giving the Board of Trustees the "full discretion" to administer the Trust in the same manner as if it were their own property.

In my view, these Trustees have fully and faithfully complied with the plain directives in the Trust Deed, and I would affirm the decree.

---

Ed. F. McFaddin, Justice, dissenting. For convenience, I refer to the appellant as "The College" and the appellee as "The Trustees." The Chancery Court made the following as its decree:

"(a)  The 'Trustees' of Respondent are not required to distribute to the Petitioner all net income, but that, acting in good faith, they may distribute each year all or such part of the net income from the Trust properties as they deem best.

"(b)  The Trustees may refuse to distribute net income to the College for reasons other than injury to the Corpus.

"(c)  That the 'Board' or the College, or a four year College, may not compel the distribution of net income of the Trust.

"(d) (e)  That the Trustees of George W. Donaghey Foundation have no control over the educational policies of the College, and the Board of Directors of the College have no control over the policies of the Board of Trustees of the Donaghey Foundation; that the College shall be operated by its Board under the power and authority granted by its Constitution and under the authority of the Laws of the State of Arkansas governing the creation of eleemosynary corporations; and that the Donaghey Foundation shall be governed by and operated under the powers granted to its Board of Trustees by the Deed in Trust, creating the said Trust.

"(f)  That it is within the power of the 'Board' (of the College) to expand the College to a four year college without the consent of the Trustees (of the Donaghey Foundation) but that such a four year college is not or would not be a 'Successor' to the 'Present Little Rock Junior College', and the said Trustees shall not be

required to make any distribution of income from the Trust to such a four year college.

"(g) That a four year institution (college) will not have the same rights, powers, duties and obligations under the 'Deed in Trust' as the present Little Rock Junior College."

I agree with the findings of the Chancery Court; so I necessarily dissent from the opinion of the majority of this Court.

To reach the conclusion that it has reached, the majority has necessarily found each and all of the following:

(1) That the statements contained in Governor Donaghey's books, written many years after the execution of the Trust Deed here involved, may be received in evidence as affecting or changing the language contained in the Trust Deed.

(2) That the Trustees have acted arbitrarily in refusing to pay the College the $75,000.00.

(3) That the Trustees must pay to the College the income of the Trust, regardless of whether the College is a Junior or a Senior College, and regardless of the discretion the Trustees desire to exercise.

I most vigorously dissent from each of these holdings. As regards the first point, it is certainly "new law" to say that what a man wrote in a book—years after he executed a solemn instrument—can be used to vary the terms of the instrument: yet that is what the majority is holding. I see no ambiguity in the Trust Deed, so there is no reason to resort to "other writings" of the Trust settlor.

Coming to the other two matters, I express my views as follows:

I. *The Discretion Allowed The Trustees By The Deed.* When Governor Donaghey executed the Trust Deed in 1929 covering the Donaghey Building and the Waldon Building, he named seven men as Trustees. They

were: G. DeMatt Henderson, J. F. Loughborough, A. G. Kahn, F. W. Neimeyer, Charles L. Thompson, Leo Pfeifer and Fred W. Allsopp. These Trustees were allowed to fill any vacancies, so that in this suit the Trustees are: C. L. Thompson, A. G. Kahn, Leo Pfeifer, William Nash, C. E. Lowry, Dr. Henry G. Hollenberg, and John Rule. Among other provisions in the Trust Deed, I quote these:

(1) "No compensation shall be paid to any Trustee . . ."

(2) "The surviving Trustees shall at all times have the right to fill any vacancy in their membership caused by death, resignation, or otherwise . . ."

(3) "Said Trustees . . . shall have the sole and exclusive management, control, and direction of said property . . . and in every respect to deal with and handle and manage said properties as an individual might do . . ."

(4) "After paying all interest, principal, fixed charges, upkeep, insurance and all operating expenses maturing during any year, the Trustees *may* annually (or more frequently, if they deem best) pay over on January 1st of each year all or such part of the net income from the said properties *as they deem best; . . .* In the event there should at any time be accumulations of net income under the terms hereof, the same may be expended for the purposes of this trust at such times and in such amounts *as the Trustees think best."* (Italics supplied.)

(5) "In the event there should at any time be accumulations of net income under the terms hereof, the same may be expended for the purposes of this Trust *at such times and in such amounts as the Trustees think best."* (Italics supplied.)

(6) "It is the intention hereof that the Trust hereby created shall continue perpetually, except that the Trustees . . . may, by unanimous vote at any time after 50 years from the date of this instrument, expend

all or any part of the Trust Fund or property and all and any accumulations of income then in their hands, for the purpose of erecting or contributing to the erection of a permanent building or buildings. . ."

(7) "Nothing herein contained shall require the Trustees at any time to expend any portion of the principal of said Trust Fund or property . . ."

(8) "The said Trustees shall have absolute right to determine, by a majority vote, all necessary rules and regulations for the management and control of the properties . . ."

I have copied at length from the Trust Deed to show the *broad discretion* allowed the Trustees, who serve without remuneration. In the face of such broad discretion, the majority of this Court is now holding that the Trustees—even against their vote and better judgment—must deliver income from the Trust to the College. I cannot so interpret the Trust Deed.

II. *How The Trustees Wish To Exercise Their Discretion.* The majority opinion entirely ignores one of the major contentions made by the Trustees in this case, which is the right of the Trustees to build up a reserve for the protection of the Trust. The testimony of the witnesses, T. W. Kirkwood, Russell Brown, and A. G. Kahn, on this most important angle of the case, is found on pages 86 to 131 (inc.) of the transcript. The Trustees say that to now *require* them to distribute trust income is tantamount to requiring them to distribute trust income at any subsequent time that the College may desire it; that the expense of a Senior College is far greater than the expense of a Junior College; that if the College starts out to be a Senior College, then it can, year after year, go into Court and require the distribution of the income from the Trust without allowing the Trustees to exercise their discretion to build up the permanent reserve fund of the Trust; and that in effect the Courts will be taking over the discretion reposed in the Trustees and the perpetual Trust will fail because

the Trustees will not have been allowed to build up a suitable permanent reserve fund. I certainly agree with these contentions.

The testimony reflects that on July 1, 1929, Governor and Mrs. Donaghey executed the Trust Deed, here involved, which transferred to the Trustees two buildings in Little Rock located at 7th and Main Streets, and being the Donaghey Building and the Waldon Building.[1] At that time, the two buildings were mortgaged for a balance of $760,000.00 and interest. The Trust Deed provided that the Trust was to pay Governor Donaghey the sum of $1,000.00 per month for the remainder of his life, and then to pay Mrs. Donaghey $750.00 per month for the remainder of her life. These payments to Governor and Mrs. Donaghey, and the payment of the interest and the mortgage, required substantially all of the income of the Trust: so that no depreciation account was ever set up for the buildings until after Governor Donaghey's death in 1937. Then the Trustees had the buildings appraised as of 1929 and set up a depreciation account of 2% per annum. As of December 31, 1953, the total depreciation so claimed was $942,569.97. Against this depreciation account, $204,592.60 had been spent to improve the Waldon Building, so that the net depreciation account on the books was $737,977.37.

Good accounting requires that the permanent reserve fund should equal the net depreciation account. In other words, the Trust should have on hand, in bonds or other assets, a permanent reserve fund to equal every dollar shown in the net depreciation account. But when we examine the permanent reserve fund, we see that it only has $364,733.07 on hand. In other words, there is

---

[1] The record (Tr. 89) reflects that several years after this Deed of Trust covering the Donaghey Building and the Waldon Building, Governor and Mrs. Donaghey conveyed to the Trustees, by instruments not in the present record, some property at 119 Main Street and also some property at 8th and Main Streets. The income from these two latter properties (not appreciable, when compared with the income from the Donaghey and Waldon Buildings) is included in the audits and figures supplied to the Court by the Trustees. But the major part of the record here relates to the situation as regards the Donaghey Building and the Waldon Building.

a deficiency in the permanent reserve fund of $373,244.30. This is because the Trustees have been paying money to the College instead of putting it in the permanent reserve fund. The Trustees want to limit their contributions to the College for several years, until the permanent reserve fund equals the depreciation account; and that is certainly a good, sound accounting principle. Mr. Russell Brown, a Certified Public Accountant, has so advised the Trustees. His letter of 1952 is in the record; and he so testified before the Court. It was testified that it would require half a million dollars to air-condition the Donaghey building, in order to keep the building occupied with tenants capable of paying the rents. The Trustees want to limit the amount to be paid the College for a number of years, until they can build up the permanent reserve fund. I think the Trustees have full authority to withhold all payments to the College, in their discretion. Mr. A. G. Kahn, one of the Trustees selected by Governor Donaghey and still serving, testified that this Donaghey Trust was one of the most vulnerable trusts with which he was acquainted, because it had no diversification; that the income is derived entirely from buildings located in a concentrated locality; and that if the Trust is to be perpetual, these buildings must be kept modern against eventualities of any competing office building that might be constructed in Little Rock.

In the light of all of this testimony: when we consider that the Trustees are serving without remuneration; that they are trying to keep the Trust perpetual; that they have not yet on hand in the permanent reserve fund enough to equal the net depreciation allowed by the Government; and that the buildings are old and need to be made modern in many respects—in the light of all these matters—I cannot see how the majority of this Court can interfere with the discretion that these Trustees are seeking to exercise; and I cannot see how the majority of this Court can substitute its views for those of the Trustees. If this Court can direct the Trustees to pay $75,000.00 a year to the College now, it

can direct the Trustees to pay double that amount or any other amount that the College may say it needs.

The whole case gets back to the point that the Trustees should be allowed to exercise their discretion. It would be nice for Little Rock to have a senior college: but this Court should certainly refuse to do violence to the Trust Deed in this case. Courts are not constituted to legislate: they are to interpret the meaning of trust instruments. By this trust instrument Governor Donaghey invested these Trustees with *full discretion*. The record shows that they are attempting to exercise their discretion in a wise and prudent manner. The majority of this Court is interfering with the discretion reposed in the Trustees.

Therefore, I respectfully dissent.